**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DANIEL M. BERRY,
           *Plaintiff-Appellant,*

v.

DEPARTMENT OF SOCIAL SERVICES,
Tehama County; BILL SNELSON,
Director,

           *Defendants-Appellees.*

No. 04-15566

D.C. No.
CV-02-00942-LKK

OPINION

Appeal from the United States District Court
for the Eastern District of California
Lawrence K. Karlton, Senior Judge, Presiding

Argued and Submitted
November 18, 2005—San Francisco, California

Filed May 1, 2006

Before: Jerome Farris, A. Wallace Tashima, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Callahan

**COUNSEL**

Anthony J. Poidmore, Roseville, California, and Brad Dacus and James Griffiths, Pacific Justice Institute, Sacramento, California, for the plaintiff-appellant.

J. Scott Smith and Laurence L. Angelo, Angelo, Kilday & Kilduff, Sacramento, California, for the defendants-appellees.

**OPINION**

CALLAHAN, Circuit Judge:

Daniel M. Berry filed this lawsuit alleging that his public employer, the Tehama County Department of Social Services ("Department"), was violating his rights under the First Amendment of the United States Constitution and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, by prohibiting him from discussing religion with his clients, displaying religious items in his cubicle, and using a conference room for prayer meetings. The district court granted summary judgment in favor of the Department, Mr. Berry appealed, and we affirm. Applying the balancing standard set forth in *Pickering v. Board of Education*, 391 U.S. 563 (1968), we conclude that the Department has successfully navigated between the Scylla of not respecting its employee's right to the free exercise of his religion and the Charybdis of violating the

Establishment Clause of the First Amendment by appearing to endorse religion. Specifically, we hold that the public employer's interests in avoiding violations of the Establishment Clause and in maintaining the conference room as a nonpublic forum outweigh the resulting limitations on Mr. Berry's free exercise of his religion at work. We also hold that the public employer was not required to further accommodate Mr. Berry's religious views under Title VII.

I

Mr. Berry describes himself as "an evangelical Christian who holds sincere religious beliefs that require him to share his faith, when appropriate, and to pray with other Christians." The Department has employed Mr. Berry since 1991. In 1997, he transferred to the employment services division. His official duties involve assisting unemployed and underemployed clients in their transition out of welfare programs. These duties frequently require him to conduct client interviews. The record shows that over ninety percent of these interviews take place in Mr. Berry's cubicle.

At the time of his transfer, the Department told Mr. Berry that its policy was that employees in his position were not allowed to talk about religion with clients and the agencies the employees contacted. Mr. Berry acquiesced to this position. In fact, he initially thought that he was prohibited from talking about religion from the moment he arrived at work until the moment he left. Mr. Berry testified that one day his daughter called him on the phone when she was sick at home and he felt that he was prohibited from praying with his daughter. Accordingly, he approached his supervisor who clarified that the prohibition on talking about religion only applied to clients.

Mr. Berry, nonetheless, was uncomfortable with the restriction and requested to be relieved from it, as he felt that it conflicted with his religious beliefs. In January 2002, he received

a counseling memorandum instructing him to "adhere to the Department's policy about absolute avoidance of religious communications with participants and/or other persons (such as Child Care Providers) that you have contact with as part of your employment."

The Department does not prohibit Mr. Berry from talking about religion with his colleagues. Around January 2001, he organized a monthly employee prayer meeting that was to take place in the Red Bluff Room, a conference room in the Department's facility. The prayer meetings were voluntary and were held at lunch time. The Director of the Department told Mr. Berry that he could not use the Red Bluff Room for these meetings. Mr. Berry, however, continued to conduct the prayer meetings there without scheduling the meetings in any official manner. In April 2001, the Director sent Mr. Berry a letter reiterating that prayer meetings could not be held in the Red Bluff Room.[1] Mr. Berry was informed that he could pray

---

[1]The letter states, in relevant part:

> Firstly, I have not been empowered by the Board of Supervisors to allow County facilities to be used for non-County purposes.

> For clarification let me restate part of what you were told around the first of the year. If ANY group is given permission to use a non-public portion of our building for purposes other than that directly associated with the carrying out of our administrative duties as Social Services, then that use opens up the non-public portions of the building to ANY and ALL groups that wish to request usage thereof. I would be required to grant permission, if requested, to ANY and ALL who would ask regardless of the purpose or motivation of said group. I am not willing to do that. Therefore, you may not use these facilities for the purpose of praying as an organized or informal group.

> Let me make it perfectly clear that I am in no way infringing on your constitutional right of free speech. As you are aware, freedom of speech and expression are constitutionally protected by the First Amendment of the United States Constitution. However the privileges afforded by the First Amendment are not unlimited, the constitutionality of limitations on speech vary depending

in the break room during regular lunch hours or he and his group could go outside and pray on the departmental grounds.

Although employees were generally allowed to decorate their cubicles, when he transferred to the employment services division in 1997, Mr. Berry received a memorandum from his supervisor that explained:

> You may not display religious items in an area where those items are visible to any applicant, recipient, or participant under or within any program administered by the Department of Social Services.

Mr. Berry stated that sometime in the fall of 2001, he contacted a civil rights organization to inquire whether he could legally keep a Bible on his desk and decorate his cubicle with faith-related items. Apparently encouraged by the response he received, Mr. Berry in early December 2001, put a Spanish language Bible on his desk and hung a sign that read "Happy Birthday Jesus" on the wall of his cubicle.

On December 6, 2001, Mr. Berry received a letter of reprimand instructing him that he could not display religious items that were visible to clients. The letter referenced the 1997 memorandum and instructed him to remove the name "Jesus" from the sign and to remove the Bible from the view of his

---

upon the forum used to express speech. You are free to believe as you see fit and to express those views in the appropriate forum.

Whether it be your intent or not, using a County conference room for public purposes (i.e. non County related) transforms it into a public forum that can be used by any group of any persuasion, whether or not they are employed by the County.

Lastly, Article XVI, section 5 of the California Constitution forbids any county from aiding or supporting any religious sect, church, creed or sectarian purpose with public funds.

clients.[2] Mr. Berry complied by removing the sign and keeping his Bible hidden from view.

Following the December 6, 2001 letter of reprimand, Mr. Berry filed charges with the Equal Employment Opportunity Commission ("EEOC"). He requested and received a "right to sue letter" from the EEOC and, on May 1, 2002, filed this action. The complaint sought injunctive and declaratory relief. Specifically, it sought judicial declarations that the Department was required, under the First Amendment of the Constitution and Title VII, to accommodate Mr. Berry's religious beliefs by allowing him to (1) share his religious view with clients where they "initiate the discussion or are open and receptive to such discussions," (2) use the conference room for voluntary prayer group meetings, and (3) display religious objects in his cubicle.

---

[2]The letter stated, in part:

On October 3, 2001 you were informed by me that if you did not interview in your work area you could display religious items. You were also told that since you do interview at your area, your work space is not a "private work space" and therefore you may not display religious items that are visible to the clients.

This week you have placed a Bible in plain view to the clients that you interview in your work area. This week you also have placed a sign on the County's wall in plain view of your clients in your work area which reads "Happy Birthday Jesus."

You have deliberately placed these items in your work area knowing that we have specifically provided instructions to you prohibiting such display and non-verbal communication to the clients.

You are instructed to immediately remove the Bible from view of the clients. You may put the Bible in your desk or in a large envelope which we are providing you. You are instructed to remove the "Jesus" part of your Happy Birthday Jesus sign which you have placed on the wall of your work area. The issue is that the Bible and other religious non-verbal communications can not be visible to your clients.

In due course, the parties filed cross-motions for summary judgment. The district court denied Mr. Berry's motion and granted the Department's motion. Mr. Berry then filed a timely notice of appeal.

II

We review the district court's grant of summary judgment de novo. *Doe v. Lebbos*, 348 F.3d 820, 825 (9th Cir. 2003). Whether an employee's speech is protected under the First Amendment and whether a restriction on speech is constitutional are also reviewed de novo. *See Hyland v. Wonder*, 972 F.2d 1129, 1134 (9th Cir. 1992) ("Whether [ ] speech is protected by the First Amendment and is a matter of 'public concern' is a question of constitutional law we review de novo."); *see also Daily Herald Co. v. Munro*, 838 F.2d 380, 383 (9th Cir. 1988) ("When a district court holds a restriction on speech constitutional, we conduct an independent, de novo examination of the facts.").

III

### A.  *Limitation on Mr. Berry's Speech with Clients*

**[1]** The district court applied the *Pickering* balancing test to the Department's limitation of Mr. Berry's speech with clients. The Court in *Pickering* commenced with the recognition that teachers as public employees do not relinquish the First Amendment rights they would otherwise enjoy as citizens.[3] 391 U.S at 568. The Court, however, also recognized that a

---

[3]The Supreme Court has consistently recognized public employees' rights under the First Amendment. *See City of San Diego v. Roe*, 543 U.S. 77, 80 (2004) ("[A] government employee does not relinquish all First Amendment rights otherwise enjoyed by citizens just by reason of his or her employment."); *see also Connick v. Myers*, 461 U.S. 138, 142 (1983) ("For at least 15 years, it has been settled that a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.").

"State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Id*. It held that the reconciliation of these competing interests requires "a balance between the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* The Supreme Court in 2004 reaffirmed the use of the *Pickering* balancing test "[t]o reconcile the employee's right to engage in speech and the government employer's right to protect its own legitimate interests in performing its mission." *City of San Diego v. Roe*, 543 U.S. 77, 82 (2004).

Mr. Berry, however, argues that we should apply a stricter test instead of a balancing test because the Department's restrictions on his religious speech to clients violate his rights under both the Free Exercise and the Free Speech clauses of the First Amendment. Mr. Berry reasons that this is consistent with such cases as *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993), and *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990).[4]

We decline Mr. Berry's proposal because it does not take into consideration the employer's interests that led the Supreme Court to adopt the *Pickering* balancing test in the first place.[5] *Pickering*, 391 U.S. at 568. Our rejection of the

---

[4]Neither of these cases are directly applicable as they concerned government restrictions on citizen activities — the sacrifice of an animal as part of a religious ceremony in *Church of Lukumi Babalu*, and the use of peyote as part of a religious ceremony in *Smith* — rather than a public employer's limitation on an employee's speech.

[5]It is true that in *Smith*, the Court discusses the "application of a neutral, generally applicable law to religiously motivated action" which implicates "the Free Exercise Clause in conjunction with other constitutional protections." 494 U.S. at 881. The Court, however, recognized that its discussion

use of a stricter test is supported by the Supreme Court's 2004 opinion in *Roe*, which again applied the *Pickering* balancing test to limitations on employee speech. 543 U.S. at 82. Moreover, the Supreme Court clarified that not all employer limitations on an employee's speech warrant judicial review even under a balancing test, but only those restrictions that raise some credible constitutional concern. *Id.* The Court in *Roe* explained "*Pickering* did not hold that any and all statements by a public employee are entitled to balancing. To require *Pickering* balancing in every case where speech by a public employee is at issue, no matter the content of the speech, could compromise the proper functioning of government offices." 543 U.S. at 82. *See also Connick v. Myers*, 461 U.S. 138, 146 (1983).[6] Accordingly, we decline to subject the

---

of "hybrid" situations was dicta. *Id.* at 882 ("The present case does not present such a hybrid situation[.]"); *see also Knight v. Conn. Dep't of Pub. Health*, 275 F.3d 156, 167 (2nd Cir. 2001) ("Appellants' reliance on *Smith* is misplaced, as the language relating to hybrid claims is dicta and not binding on this court."). Furthermore, the Court noted that it had rarely applied the stricter test set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963), by which "governmental actions that substantially burden a religious practice must be justified by a compelling governmental interest." *Smith*, 494 U.S. at 883.

[6]After reviewing the evolution of the law from the time when the "unchallenged dogma was that a public employee had no right to object to conditions placed upon the term of employment," 461 U.S. at 143, to the Court's decision in *Pickering*, the Court wrote in *Connick*:

> *Pickering,* its antecedents and progeny, lead us to conclude that if [the employee's] questionnaire cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for us to scrutinize the reasons for her discharge. When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment. Perhaps the government employer's dismissal of the worker may not be fair, but ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable.

461 U.S. at 146 (footnote omitted).

Department's restrictions on Mr. Berry's speech to a stricter test.

Instead, we adhere to our practice of applying a balancing test when confronted with constitutional challenges to restrictions on public employee speech in the workplace. In *Tucker v. State of California Department of Education,* 97 F.3d 1204 (9th Cir. 1996), we rejected a similar contention that we should apply a stricter test, and instead reviewed a public employer's limitations on an employee's religious speech pursuant to the "applicable doctrine, which is found in the case law governing employee speech in the workplace." *Id.* at 1209-10. In a prior case concerning a high school teacher's challenge to a restriction barring him from discussing religion with students, we held that the school district's interest in avoiding an Establishment Clause violation trumped the teacher's right to talk to students. *Peloza v. Capistrano Unified Sch. Dist.*, 37 F.3d 517, 522 (9th Cir. 1994).

**[2]** The balancing test we applied in *Tucker* and *Peloza*, and which we apply in this case, is a slight variation on the *Pickering* balancing test. In *Roe*, the Supreme Court stated that the *Pickering* balancing test:

> requires a court evaluating restraints on a public employee's speech to balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."

*Roe*, 543 U.S. at 82 (quoting *Pickering*, 391 U.S. at 568). Here, Mr. Berry contends that his speech is protected under the First Amendment as religious speech, rather than as comments upon matters of public concern. Nonetheless, we conclude that the *Pickering* balancing approach applies regardless of the reason an employee believes his or her speech is consti-

tutionally protected.[7] Mr. Berry, of course, is entitled to seek the greatest latitude possible for expressing his religious beliefs at work. The Department, however, must run the gauntlet of either being sued for not respecting an employee's rights under the Free Exercise and Free Speech clauses of the First Amendment or being sued for violating the Establishment Clause of the First Amendment by appearing to endorse its employee's religious expression. The *Pickering* balancing test recognizes these important, but sometimes competing, concerns and allows a public employer to navigate a safe course.

**[3]** Applying the *Pickering* test to the Department's restriction on Mr. Berry's speech with clients, we determine that the restriction is reasonable. The Supreme Court has reiterated that avoiding an Establishment Clause violation may be a compelling state interest. *See Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993) (remarking that "the interest of the State in avoiding an Establishment Clause violation 'may be [a] compelling' one justifying an abridgment of free speech otherwise protected by the First Amendment" (quoting *Widmar v. Vincent*, 454 U.S. 263, 271 (1981)); *see also Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 112 (2001) ("We have said that a state interest in avoiding an Establishment Clause violation 'may be characterized as compelling,' and therefore may justify content-based discrimination." (quoting *Widmar*, 454 U.S. at 271)).

**[4]** Moreover, unlike the situations presented in *Lamb's Chapel* and *Good News Club*, the Department's concern with an Establishment Clause violation is well taken. The Department's clients seek assistance from Mr. Berry in his capacity as an agent of the state. Accordingly, they may be motivated to seek ways of ingratiating themselves with Mr. Berry, or conversely, they may seek reasons to explain a perceived fail-

---

[7]The Second Circuit has reached a similar conclusion. *Knight*, 275 F.3d at 167.

ure to assist them. It follows that any discussion by Mr. Berry of his religion runs a real danger of entangling the Department with religion. This danger is heightened by Mr. Berry's admission that unless restricted, he will share his faith with others and pray with them.[8] Although Mr. Berry states he will only do so "when appropriate," he does not explain how he determines when sharing his religion is appropriate. Furthermore, any legal consequences from Mr. Berry's discussion of religion with clients will fall upon the Department, as much as, if not more than, on Mr. Berry. We conclude that under the balancing test, the Department's need to avoid possible violations of the Establishment Clause of the First Amendment outweighs the restriction's curtailment of Mr. Berry's religious speech on the job.

### B. Limitations on the Display of Religious Items

Mr. Berry contends that the Department's refusal to allow him to display a Bible or a "Happy Birthday Jesus" sign is "viewpont discrimination." He further suggests that compared to his religious speech "there is even less danger that a mere posting of material with religious content, or the placement of a Bible on the desk of a Department employee will cause a

---

[8]Mr. Berry's objection that there have not been any client complaints against him is not well taken. He has been prohibited from discussing his religion with clients from the day he accepted his position. Although it appears that Mr. Berry has for the most part abided by that limitation, an unchallenged portion of the Department's statement of undisputed facts filed in the district court recites:

> In deposition testimony, Plaintiff has admitted that from time to time he has had religious conversations with, or prayed in the presence of County's clients. On one occasion, he prayed in the presence of one of his Hispanic clients who first asked him to pray for a family member, and later asked Plaintiff to pray directly with her, which he did. On another occasion, Plaintiff prayed in Spanish for a client who was caught being dishonest, however, he did not believe that the client knew that Plaintiff was praying for him at the time.

reasonable observer to believe that the County has suddenly set up shop as a religious agency."

We hold that the Department's restrictions on the display of religious items are reasonable under the *Pickering* balancing test. Our opinion in *Tucker* is instructive. In *Tucker*, we first noted that the government "has a greater interest in controlling what materials are posted on its property than it does in controlling the speech of the people who work for it." *Tucker*, 97 F.3d at 1214. We also recognized that materials posted on the walls of the corridors of government offices may be interpreted as representing the views of the state. *Id.* We, nonetheless, struck down an order that prevented the display of religious materials outside employees' cubicles or offices, when employees were free to post materials on other subjects. In doing so, however, we noted:

> The state's strongest argument is that allowing the posting of religious material on the interior space of the building in question would give the appearance of government endorsement of religious messages. Such endorsement would, of course, be unconstitutional.

97 F.3d at 1215 (citing *County of Allegheny v. ACLU*, 492 U.S. 573, 592-601 (1989)).

**[5]** In *Tucker*, the public did not have access to the office areas at issue. 97 F.3d at 1212. Here, the very reason for the Department's restrictions is that clients have access to Mr. Berry's cubicle and might reasonably interpret the presence of visible religious items as government endorsement of religion. Mr. Berry is not deprived of his Bible. He may keep it in his desk drawer and may read it whenever he does not have a client with him in his cubicle. Displaying the Bible implicitly endorses a religious message and it is precisely that message which the Department reasonably seeks to avoid.[9] We con-

---

[9]The Department's concern that the presence of religious items on public property *may* give rise to an implied endorsement of religion finds

clude that under the balancing test, the Department's need to avoid an appearance of endorsement of religion outweighs the curtailment on Mr. Berry's ability to display religious items in his cubicle, which is frequented by the Department's clients.

### C. Use of the Conference Room for Prayers

Mr. Berry claims that the Red Bluff Room is open to other nonbusiness-related meetings and therefore allowing individual employees to use the room for prayer would not be seen as endorsing religion. He contends that the room had been used for such activities as "Junior Mints," "social organizations," "rodeo-theme picnics," baby showers, and birthday celebrations. The district court, however disagreed, noting:

> There is no evidence in the record here demonstrating that the Red Bluff Room is used for anything other than official business meetings and business-related social functions, such as employee birthday parties, of the sort ordinarily allowed by employers in meeting areas. There is no evidence of the County ever having allowed any religious or political group to meet in the space or announcing its intention to allow such a meeting. Indeed, there is no evidence that the room has been made publicly accessible at all. Thus, the conference room falls into that category of public property which is "not intended to be a forum for the public expression of ideas and opinions." *May* [*v. Evansville-Vanderburgh School Corp.*], 787 F.2d [1105,] 1113 [(7th Cir. 1986)].

**[6]** The Supreme Court in *Cornelius v. NAACP Legal*

some support in the Supreme Court's recent opinions in *McCreary County v. ACLU*, 125 S. Ct. 2722 (2005), and *Van Orden v. Perry*, 125 S. Ct. 2854 (2005).

*Defense & Educational Fund*, 473 U.S. 788, 802 (1985), held that "[t]he government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse."[10] The Court further held "[t]he Government's decision to restrict access to a nonpublic forum need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation." *Id*. at 808 (emphasis in original). In *Arkansas Educational Television Commission v. Forbes*, (*Forbes*), 523 U.S. 666 (1998), the Court further noted that "the government does not create a designated public forum when it does no more than reserve eligibility for access to the forum to a particular class of speakers, whose members must then, as individuals, 'obtain permission.' " *Id*. at 679 (internal citation omitted).[11]

---

[10]In *Cornelius*, the Supreme Court noted that it had identified three types of fora in *Perry Education Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 44 (1983):

> [1] the traditional public forum, [2] the public forum created by government designation, and [3] the nonpublic forum. Traditional public fora are those places which "by long tradition or by government fiat have been devoted to assembly and debate." 460 U.S. at 45, 103 S.Ct. at 954. Public streets and parks fall into this category. See *Hague v. CIO,* 307 U.S. 496, 515, . . . (1939). In addition to traditional public fora, a public forum may be created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects. *Perry Education Assn., supra,* 460 U.S., at 45 and 46, n. 7. . . . Of course, the government "is not required to indefinitely retain the open character of the facility." *Id*., at 46, 103 S.Ct., at 955.

473 U.S. at 802.

[11]The Court offered the following explanation for its policy:

> The *Cornelius* distinction between general and selective access furthers First Amendment interests. By recognizing the distinction, we encourage the government to open its property to some expressive activity in cases where, if faced with an all-or-nothing choice, it might not open the property at all. That this distinction turns on governmental intent does not render it unprotective of

Accordingly, we must first consider whether accepting Mr. Berry's allegations as true, there is sufficient evidence from which a trier of fact could determine that the Department has opened the Red Bluff Room to public discourse.

Our review of the record reveals that the Department held an annual western-style barbecue for its employees in conjunction with the annual Red Bluff Rodeo and, on that occasion, food was placed in the Red Bluff Room for the employees to eat. "Junior Mints" was a group that helped put on the annual Rodeo Day barbecue for the employees. The only other evidence in the record of use of the Red Bluff Room by a "social organization" concerned an occasion when some employees sought to organize a "Relay for Life" walk to raise money for cancer research.[12] Although the group used the room once, the Director then determined that the "Relay for Life" group was a nonbusiness related group and stopped the group from using the room, just as he did with Mr. Berry.

**[7]** Thus, the only permitted use of the Red Bluff Room that was not generally associated with the Department's administrative duties was for birthday parties and baby showers. This appears to be similar to the reservation of "eligibility for access to the forum to a particular class of speakers" which the Supreme Court in *Forbes* held did not create a pub-

---

speech. Rather, it reflects the reality that, with the exception of traditional public fora, the government retains the choice of whether to designate its property as a forum for specified classes of speakers.

523 U.S. at 680.

[12] Although Berry's brief mentions the use of the Red Bluff Room for "quilting group meetings" there is no support for this conclusory allegation in the record. *See Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001) (holding that a "court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found.").

lic forum. 523 U.S. at 679. It is certainly not the type of intentional opening of a nontraditional forum for public discourse that the Supreme Court has indicated is necessary to convert a nonpublic forum into a public forum. *Cornelius*, 473 U.S. at 808. Accordingly, we determine that the Red Bluff Room remains a nonpublic forum.

Mr. Berry argues that even for a nonpublic forum the government regulation of speech must be reasonable, and that the restriction may not be based on disagreement with the speaker's view. He cites Justice O'Connor's concurring opinion in *International Society for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672 (1992), that the question is whether restrictions are "reasonably related to maintaining the multipurpose environment that the [authority] has deliberately created." *Id.* at 689.

This approach fails for several reasons. First, the Red Bluff Room does not have the multiple purposes presented by the airport at issue in *Lee*. Second, the reason given by the Department for not allowing Mr. Berry to use the Red Bluff Room was viewpoint neutral. Third, in light of the Department's prior denial of use of the Red Bluff Room by the "Relay for Life" group, and the lack of any evidence that the Department permitted the use of the Red Bluff Room for any other social organizations, we are compelled to conclude that Mr. Berry was denied the use of the Red Bluff Room because he sought to use it for a nonbusiness-related activity, and not because that activity happened to be religious.

**[8]** We conclude that the Department's decision to allow the Red Bluff Room to be used for birthday parties and baby showers, but not by employee social organizations is a "reasonable" limitation as defined by the Supreme Court in *Cornelius* and *Forbes*.[13] The Department could reasonably

---

[13]The Supreme Court's approach to "reasonableness" in *United States v. Kokinda*, 497 U.S. 720 (1990), is instructive. At issue was a Postal Ser-

determine that such business-related social functions furthered its administrative tasks in ways that employee social organizations and prayer meetings would not. Birthday parties and baby showers are arguably less likely to challenge employees' religious beliefs, are less likely to exclude employees and are unlikely to be held to "honor" any individual employee more than once a year. Certainly the distinction is not compelling, but we think that it is reasonable, and that is all that is required for a nonpublic forum. *Cornelius*, 473 U.S. at 808. We conclude that the Department's decision to deny Mr. Berry's proposed use of the Red Bluff Room, a nonpublic forum, for prayer meetings did not violate his rights under the First Amendment.

## IV

Mr. Berry also advances claims of religious discrimination under Title VII. He argues that the Department failed to accommodate his religious beliefs when it (a) prohibited him from discussing religion with the Department's clients and (b) required that he not display his Bible and remove a religious sign from his cubicle's wall. In addition, he sets forth a

---

vice regulation prohibiting the solicitation of contributions on a sidewalk adjacent to a post office. Justice O'Connor's plurality opinion first found that the sidewalk was not a public forum, and noted "[e]ven conceding that the forum here has been dedicated to some First Amendment uses, and thus is not a purely non-public forum, under *Perry*, regulation of the reserved non-public uses would still require application of the reasonableness test." 497 U.S. at 730. Justice O'Connor then reviews the Postal Services experiments over 15 years with various exceptions to its rule against solicitation, and concludes:

> [w]hether or not the Service permits other forms of speech, which may or may not be disruptive, it is not unreasonable to prohibit solicitation on the ground that it is unquestionably a particular form of speech that is disruptive of business.

*Id.* at 733. Justice Kennedy, concurring in the judgment, opined that the regulation met the traditional standards applied to time, place and manner restrictions. *Id.* at 738.

disparate-treatment claim based on the Department's refusal to allow him to use the Red Bluff Room for prayer meetings.

### A.   The Failure-to-Accommodate Claims

**[9]** Title VII claims are analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Bodett v. Coxcom, Inc.*, 366 F.3d 736, 743 (9th Cir. 2004); *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004). Accordingly, for his failure-to-accommodate claims, Mr. Berry must first set forth a prima facie case that: "(1) he had a bona fide religious belief, the practice of which conflicts with an employment duty; (2) he informed his employer of the belief and conflict; and (3) the employer discharged, threatened, or otherwise subjected him to an adverse employment action because of his inability to fulfill the job requirement." *Peterson*, 358 F.3d at 606. We agree with the district court that Berry has established a prima facie case by showing that: "(1) he is an evangelical Christian who believes in sharing his faith with others and he was reprimanded for this practice insofar as he communicated with clients about religion; (2) he informed his employer of his beliefs and the conflict; and (3) the employer, at least implicitly, threatened some adverse action by formally instructing him not to pray with or proselytize to clients."

**[10]** Once a prima facie showing has been made, the burden shifts to the Department to show that "it initiated good faith efforts to accommodate reasonably the employee's religious practices or that it could not reasonably accommodate the employee without undue hardship." *Id.* at 606 (citing *Tiano v. Dillard Dep't Stores, Inc.*, 139 F.3d 679, 681 (9th Cir. 1998)). As undue hardship is not defined within the language of Title VII, courts have had to determine it on a case-by-case basis. *See, e.g., Beadle v. Hillsborough County Sheriff's Dep't*, 29 F.3d 589, 592 (11th Cir. 1994) (noting that "undue hardship" is not defined by statute and that the precise

reach of the employer's obligation to its employee must be determined on a case-by-case basis).

**[11]** The outer limits of "undue hardship" need not detain us as the Department has clearly demonstrated that it cannot accommodate either Mr. Berry's desire to discuss religion with the Department's clients or his preference for displaying religious items in his cubicle. As we have noted, allowing Mr. Berry to discuss religion with the Department's clients would create a danger of violations of the Establishment Clause of the First Amendment. This constitutes an undue hardship. *See Knight*, 275 F.3d at 168 ("Permitting appellants to evangelize while providing services to clients would jeopardize the state's ability to provide services in a religion-neutral matter."). Similarly, it would be an undue hardship to require the Department to accept, or have to rebut, the inherent suggestion of Department sponsorship that would arise from allowing the display of religious items in a cubicle in which Mr. Berry interviews clients who are seeking assistance. We conclude that Mr. Berry has not shown that the Department's restrictions on his religious speech to clients and on displaying religious items constitute a failure to accommodate his religious beliefs.[14]

## B.   *The Disparate-Treatment Claim*

Mr. Berry asserts a disparate-treatment claim under Title VII based on the Department's refusal to allow him to use the Red Bluff Room for prayer meetings. In order to establish a prima facie case of disparate treatment, Mr. Berry must show that "(1) he is a member of a protected class; (2) he was qualified for his position; (3) he experienced an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably, or other circum-

---

[14]Although Mr. Berry questions the adequacy of the Department's reasons for limiting his speech, he does not allege that they are pretexts for other concerns.

stances surrounding the adverse employment action give rise to an inference of discrimination." *Peterson*, 358 F.3d at 603. If Mr. Berry meets his burden of establishing a prima facie case, then under the *McDonnell Douglas* approach, the Department must offer a legitimate nondiscriminatory reason for denying him use of the Red Bluff Room. *Bodett*, 366 F.3d at 744. Mr. Berry would then be entitled to show that the Department's given reason is a pretext. *McDonnell Douglas*, 411 U.S. at 804.

Mr. Berry's disparate-treatment claim is not persuasive. First, the evidence does not support his contention that similarly situated employees were treated differently. The only evidence in the record concerning the use of the Red Bluff Room by a social organization of employees was that a group held a first meeting to organize a "Relay for Life" walk to raise money for cancer research. The Department, however, determined that this was a nonbusiness-related activity and prohibited the group from using the Red Bluff Room. This is exactly what happened to Mr. Berry. The Department determined that because Mr. Berry's use was not business related, he could not use the Red Bluff Room.

Second, even if we accept — as the district court did — that Mr. Berry has established the prima facie elements for his disparate treatment-claim as it relates to prayer meetings, the Department has presented a legitimate nondiscriminatory reason for not allowing him to use the Red Bluff Room, and Mr. Berry has not shown that this reason was a pretext. The Department declined to allow Mr. Berry to use the Red Bluff Room for prayer meetings, and appears not to have allowed other employees to use the room for nonbusiness-related activities, because it does not want to convert the room from a nonpublic to a public forum. This is a legitimate nondiscriminatory reason. *See May v. Evansville-Vanderburgh Sch. Corp.*, 787 F.2d 1105, 1111 (7th Cir. 1986) (affirming a ban on religious meetings by teachers on school property before school opened).

**[12]** Thus, Mr. Berry's effort to meet the fourth prong of a disparate-treatment claim rests solely on the Department allowing birthday parties and baby showers in the conference room. We do not think that permitting such business-related social functions supports either an inference that similarly situated individuals were treated more favorably or an inference of discrimination. As we have previously stated, we perceive a difference between business-related social functions and religious meetings. (*See* Part III.C, *supra.*) As long as the distinction is reasonable, it appears that is all that the Supreme Court requires. *Cornelius*, 473 U.S. at 808 ("The Government's decision to restrict access to a nonpublic forum need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation." (emphasis in original)). Furthermore, there is no suggestion that other employees (other than the Relay for Life group) have been granted use of the Red Bluff Room for a use similar to that sought by Mr. Berry.

Finally, the Department makes a reasonable argument that opening up the Red Bluff Room to religious meetings by all employees who requested such a meeting would be an undue hardship. Indeed, in *Forbes*, the Supreme Court noted that "the prospect of cacophony" that might result from allowing all who sought to participate in a nonpublic forum might well force the closure of the forum. 523 U.S. at 681. The Red Bluff Room is not a public forum, and we do not read the applicable Supreme Court decisions as requiring that the Department choose either to allow Mr. Berry to hold prayer meetings or to discontinue allowing business-related social functions in the conference room.[15]

---

[15]In her plurality opinion in *Kokinda*, Justice O'Connor observed:

> If anything, the Service's generous accommodation of some types of speech testifies to its willingness to provide as broad a forum as possible, consistent with its postal mission. The dissent would create, in the name of the First Amendment, a disincentive for the Government to dedicate its property to any speech activities at all.

**[13]** In sum, the record reflects that: (1) the Department declined to allow Mr. Berry to use the Red Bluff Room for prayer meetings for a legitimate nondiscriminatory reason, to maintain the room as a nonpublic forum; (2) Mr. Berry has not shown that this reason was a pretext for some discriminatory reason; and (3) Mr. Berry has not shown that other employees who sought to use the conference room for similar purposes were allowed to do so.[16] Accordingly, we agree with the district court that Mr. Berry's claim of disparate treatment is not supported by the record.

V

Public employers such as the Department face the difficult task of charting a course between infringing on employees' rights to the free exercise of their religions under the First Amendment and violating the Establishment Clause of the First Amendment by appearing to endorse their employees' religious expressions. The *Pickering* balancing test resolves these sometime conflicting constitutional rights by recognizing the legitimacy of the interests asserted by both sides. It provides a chart by which a public employer may navigate a safe course. We hold that the Department did so. While it allowed employees to discuss religion among themselves, it avoided the shoals of the Establishment Clause by forbidding them from discussing religion with its clients. Similarly, the Department allowed employees to display religious items, except where their viewing by the Department's clients might

---

497 U.S. at 733. Similarly, in this case, the Department could respond to Mr. Berry's concerns by forbidding the use of the conference room for birthday parties and baby showers rather than allowing additional uses of the room.

[16]Although not addressed by the parties, we assume that the April 1, 2001 letter from the Director to Mr. Berry informing him that he could not use the Red Bluff Room meets the "adverse employment action" prong of a disparate treatment claim. *See Peterson*, 358 F.3d at 603.

imply endorsement thus evading the reef of the Establishment Clause. The Department did not prohibit its employees from holding prayer meetings in the common break room or outside, but declined to open the Red Bluff Room to employee social or religious meetings as such use might convert the conference room into a public forum. We conclude that these restrictions were reasonable and the Department's reasons for imposing them outweigh any resulting curtailment of Mr. Berry's rights under the First Amendment of the United States Constitution or Title VII of the Civil Rights Act of 1964. The district court's grant of summary judgment to the Department and the denial of summary judgment to Mr. Berry are **AFFIRMED**.