IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| JONATHAN J. SPRAGUE, a married man, | ) | |
| | ) | No. 33352-3-III |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SPOKANE VALLEY FIRE | ) | PUBLISHED OPINION |
| DEPARTMENT, a fire district; MIKE | ) | |
| THOMPSON and LINDA THOMPSON, | ) | |
| husband and wife, and the marital | ) | |
| community composed thereof, | ) | |
| | ) | |
| Respondents. | ) | |

KORSMO, J. — Jonathan Sprague challenges the dismissal at summary judgment of his wrongful termination action, arguing that the Spokane Valley Fire Department (SVFD) violated his First Amendment rights. We affirm.

FACTS

Mr. Sprague served as a captain for SVFD. He formed the Spokane Christian Firefighters Fellowship (SCFF) and in 2011 began distributing newsletters and meeting notices for that group via the SVFD e-mail system. Captain Sprague's use of the e-mail system begat controversy and spiraled into this litigation.

His messages concerning SCFF meetings often contained scriptural passages and mentioned the topics being discussed at the meeting. SVFD responded by reminding Captain Sprague that the e-mail system was to be used for business purposes only and that e-mails should not include religious references. SVFD allowed employees to access their personal e-mail while at work, but they were not permitted to make personal use of the department's system. Sprague complained in writing that the policy constituted religious discrimination. Commissioner Monte Nesbit responded by letter and disagreed with the complaint. He summarized the SVFD e-mail policy:

> You may not use department email to post, discuss, or in any way disseminate communications that are sent for any purpose other than official SVFD business. This means you cannot send messages using your official SVFD email which discuss the Fellowship or any other private purpose. [SVFD] email may only be used to disseminate communications concerning official SVFD business.
>
> If you wish to send personal emails while on duty (if otherwise permitted under [SVFD] policy), you may do so using a personal email account (such as a Hotmail, Gmail, Yahoo, or Comcast account). Using a personal email account, you may only send messages to other personal email accounts. You may not use a personal email account to send messages or solicitations to official SVFD accounts.

Clerk's Papers (CP) at 147.

Commissioner Nesbitt also addressed use of physical and electronic bulletin boards:

> You may not post flyers, advertisements, or solicitations that contain a religious message, on either the electronic or physical bulletin boards which are maintained by the SVFD.

2

> You may continue to post flyers or advertisements of local events, food drives, and meetings. The posting may contain information as to the organization, the place, the time/date, the contact information, and the event. These type of postings are acceptable for both the electronic and physical bulletin boards. For example, you might post a notice that the Fellowship is meeting at a particular time and place, but the posting may not have a religious content.

CP at 147-48.

Captain Sprague, however, declined to follow the policy and insisted on using the SVFD e-mail system to distribute information about meetings of the SCFF. He also continued to employ scriptural passages in the e-mails and in bulletin board postings. A series of progressive disciplinary actions ensued. The first action resulted in a Letter of Counseling concerning misuse of the bulletin boards, followed two weeks later by a Letter of Reprimand involving misuse of the bulletin boards and the e-mail system. Six weeks later a two shift suspension without pay was imposed due to disobedience of an order and violations of the e-mail and bulletin boards policies. The suspension was stayed pending mediation, but the mediation efforts failed.

Three months after the suspension, SVFD gave notice of its intent to discharge Captain Sprague. The notice alleged that he had engaged in "conduct unbecoming an officer," insubordination for violating an order of a superior officer, and had willfully violated department rules, procedures, and personnel policies. CP at 208. The Board of Fire Commissioners accepted the termination recommendation and found that Captain

3

Sprague had failed to obey direct orders in violation of department practice and personnel policies, resulting in just cause for termination.

Mr. Sprague appealed to the civil service commission which conducted a public hearing at his request. He made a personal argument to the commission and the parties submitted post-hearing briefs in lieu of closing argument. The commission upheld his termination. It found that SVFD acted in good faith by imposing progressive discipline and that Mr. Sprague's insubordination merited termination. It also found that there was no evidence that SVFD applied its internal policies unevenly or discriminated against Mr. Sprague for expressing his Christian views. The commission also went on to note some relevant law relating to valid restrictions that government entities may place on nonpublic fora in the employment context.

Mr. Sprague did not appeal the civil service commission ruling. Instead, he instituted an action in superior court against SVFD and its chief. The complaint alleged violation of the free speech and freedom of religion guarantees of both the United States and Washington Constitutions, Mr. Sprague's equal protection rights under both constitutions, the federal civil rights act, and the Washington Law Against Discrimination, ch. 49.60 RCW (WLAD). The complaint sought reinstatement, damages, injunctive relief, and declaratory relief.

Eventually, the defendants moved for summary judgment on the basis of collateral estoppel. The plaintiff, in turn, sought partial summary judgment concerning the

4

constitutionality of the SVFD e-mail policy. The competing motions were argued before

Judge Kathleen O'Connor of the Spokane County Superior Court. Plaintiff's counsel

told the court that the parties were in agreement about the facts and that his client had

been insubordinate; however, the chief's order that Sprague needed to comply with the e-

mail policies was unconstitutional.

Judge O'Connor determined that collateral estoppel barred the plaintiff's cause of

action because of the factual findings included in the civil service commission's ruling.

She noted that there was identity of issues, identity of parties, and a final judgment that

was not appealed. The motion for partial summary judgment was denied and the defense

motion for summary judgment was granted.

Mr. Sprague timely appealed to this court. A panel heard oral argument on the

matter.

## ANALYSIS

This appeal presents two issues that we will address in the following order. First

we consider the contention, presented to the trial court by the partial summary judgment

motion, that the SVFD e-mail policy is unconstitutional. We then consider whether the

trial court properly found the claims barred by the doctrine of collateral estoppel.

The standards of review governing summary judgment applicable to both issues

are well settled. This court sits in the same position as the trial court and considers the

issues de novo since our inquiry is the same as the trial court's inquiry. *Lybbert v. Grant*

5

*County*, 141 Wn.2d 29, 34, 1 P.3d 1124 (2000). We view the facts, and all reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Id.* If there is no genuine issue of material fact, summary judgment will be granted if the moving party is entitled to judgment as a matter of law. *Id.*; *Trimble v. Wash. State Univ.*, 140 Wn.2d 88, 93, 993 P.2d 259 (2000).

*SVFD E-mail Policy*

The initial question before us involves Mr. Sprague's First Amendment challenge to the e-mail policy. Specifically, he argues that SVFD applied an anti-religion policy that was, therefore, not content neutral. His argument challenges the policy as it was allegedly practiced rather than as it was written. However, we turn initially to the official written policy. Given our disposition of the remaining issue, we consider the policy as it was allegedly applied in that section of this opinion.

When it is alleged that the government is improperly infringing on free speech rights, the first question is to identify the nature of the forum that is being regulated in order to determine what level of judicial scrutiny applies. *Bradburn v. N. Cent. Reg'l Library Dist.*, 168 Wn.2d 789, 813, 231 P.3d 166 (2010). In a traditional public forum, the government generally can only impose content neutral restrictions on the time, place, and manner of expression, if those restrictions are narrowly tailored to serve a significant government interest and leave open adequate alternative fora. *Sanders v. City of Seattle*, 160 Wn.2d 198, 209, 156 P.3d 874 (2007). However, in a nonpublic forum, the

6

government may impose restrictions so long as they are "'reasonable in light of the purpose served by the forum and are viewpoint neutral.'" *City of Seattle v. Eze*, 111 Wn.2d 22, 32, 759 P.2d 366 (1988) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806, 105 S. Ct. 3439, 87 L. Ed. 2d 567 (1985)). Intermediate to those categories, the government can create limited public fora by opening for use by the public as a place for expressive activity. *See Widmar v. Vincent*, 454 U.S. 263, 102 S. Ct. 269, 70 L. Ed. 2d 440 (1981).

The parties agreed the SVFD e-mail and bulletin board systems were both nonpublic fora.[1] Report of Proceedings (RP) at 29, 33. Our precedent compels the same result. *Knudsen v. Wash. State Exec. Ethics Bd.*, 156 Wn. App. 852, 865-66, 235 P.3d 835 (2010) (university e-mail system for employees was a nonpublic forum); *Herbert v. Pub. Disclosure Comm'n*, 136 Wn. App. 249, 263-64, 148 P.3d 1102 (2006) (school internal mail and computer systems were nonpublic fora).

---

[1] To the extent appellant's briefing in this court can be read otherwise, he cites to no evidence that would support finding the systems constitute limited public fora. There is no evidence that SVFD has ever opened either system to the public generally or permitted expressive activity. Rather, both of these systems have been reserved for internal, official business only. What limited exceptions are allowed are narrowly drawn and exclude expressive content. Specifically, SVFD allows limited, personal use of the e-mail system when it is incidental to work, like arranging for a babysitter because of the necessity of working late or permitting employees to post flyers about events or occasions. Consequently, these fora must be considered nonpublic.

The remaining questions are whether the SVFD policy is reasonable and viewpoint neutral. Once again, the parties[2] agreed in the trial court that it was.[3] That conclusion is unassailable. The policy of this state, expressed in the ethics in public service act, chapter 42.52 RCW, is that public resources are to be used for official public business rather than for personal benefit. *See Knudsen*, 156 Wn. App. at 860-63 (determining that e-mail sent to encourage others to lobby legislature violated de minimis use exception to statute). It would destroy the concept of a nonpublic forum to hold that limiting the use of a government computer system to government business was not reasonable. Accordingly, the written policy was a reasonable policy under the First Amendment to the United States Constitution.

The written policy also was content neutral. It distinguished between communications related to the SVFD's business and those that are personal to the employees. It is the nature of the communications, not the viewpoints expressed in them, that matters. There is no discrimination against some messages or in favor of some

---

[2] While it may seem to the casual reader that Sprague conceded the entire issue in the trial court, such is not the case. There he argued the issue from an "as applied" standpoint, while here we analyze only the facial text of the policy, an issue that was not disputed below.

[3] Sprague's counsel told the trial judge: "That written policy would be facially content neutral; it allows for some personal use and it has some proscriptive use. But it does not, on its face, say personal use would be allowed except for if it has a religious viewpoint." RP at 27.

others. Instead, there is a complete ban on private usage (absent work-related necessity) of the systems without regard to the message conveyed by the sender.

The written SVFD policy does not violate the First Amendment.

*Collateral Estoppel*

Although the parties did not truly contest the validity of the written policy, Mr. Sprague certainly contests the validity of the policy as he believes SVFD applied it. While we normally would analyze his claims under the First Amendment, our conclusion that he is collaterally estopped by the findings made in the unappealed administrative proceedings makes it unnecessary to consider the challenge to the policy that he believes the department actually followed. Thus, we turn now to the collateral estoppel issue.

On this claim, Mr. Sprague's argument is somewhat misfocused. He correctly takes issue with the civil service commission's legal conclusions, but they are not what cause him problems here. Instead, it is the unchallenged factual determinations concerning the reasons for termination that doom this appeal. The trial court correctly determined that Mr. Sprague's failure to challenge those determinations by appeal to superior court left him without a viable cause of action.

As relevant to this appeal, the doctrine of collateral estoppel serves to bar litigation where an issue of ultimate fact has already been determined in previous litigation. *State v. Mullin-Coston*, 152 Wn.2d 107, 113, 95 P.3d 321 (2004). The party seeking to enforce collateral estoppel must establish that (1) the issue previously decided is identical to the

9

one presented, (2) the prior adjudication ended in a final judgment on the merits, (3) the party against whom collateral estoppel is asserted must be the same as the party in the prior litigation, and (4) application of collateral estoppel does not work a substantial injustice. *Id.* at 114.

When considering whether to apply collateral estoppel to an administrative action, this court should consider: (1) whether the agency, acting within its competence, made a factual decision, (2) procedural differences between the agency and a court, and (3) policy considerations. *Shoemaker v. Bremerton*, 109 Wn.2d 504, 508, 745 P.2d 858 (1987). Applying these factors, *Shoemaker* concluded that civil service commissions can resolve factual issues concerning termination and employment policies and collateral estoppel can be applied to those findings. *Id.*

We agree with Mr. Sprague that the commission's legal conclusions, such as its determination that its rulings complied with the First Amendment,[4] are not subject to estoppel. Courts, not administrative agencies, determine whether the constitution has been complied with. However, *Shoemaker* confirms that a civil service commission factual finding can be given preclusive effect.

That is the case here. All of the classical elements for collateral estoppel are satisfied in this case. The issue presented to the civil service commission—whether

---

[4] CP at 55-56.

SVFD discriminated against Mr. Sprague because of religion—is the same issue presented at the heart of this action. The civil service commission action did end in a final decision. The parties are identical. There is no injustice in applying collateral estoppel in this circumstance. Mr. Sprague was the one who presented the issue to the commission; he had a full opportunity to present his case. Indeed, the only potential injustice in this situation would be to SVFD since it could face the possibility of inconsistent judgments arising from its termination of Mr. Sprague.

The commission made two related factual determinations that are dispositive in this case. First, it determined that "Sprague was not terminated for religious reasons." CP at 54. Second, it found that "there was no evidence presented . . . that the rules were applied unevenly and with discrimination based upon Sprague's expression of his Christian views." CP at 55. Like the trial court, we agree that these determinations are inconsistent with this civil action for damages and other relief. Mr. Sprague did not attack those factual findings by further appeal; he may not collaterally attack them by filing a separate law suit.

The determination that there was no alternative "as applied" policy is particularly critical to this case. Much of Mr. Sprague's claims, including his challenge to the SVFD e-mail policy, presume the existence of a policy of discrimination against the expression of religious viewpoints. Mr. Sprague can only establish the existence of such a policy if he can establish that the otherwise viewpoint neutral SVFD e-mail system policy was

11

applied in a discriminatory manner against religious expression. The civil service

commission found as a matter of fact that this was not the case. There was "no evidence"

of any such practice. It was unsurprising that the SVFD's complaints to Mr. Sprague

involved his use of religious expression, because that was the manner in which he

repeatedly violated SVFD policy against private use of government property. It should

go without saying that a fire department's business is firefighting, not discussion of

religion. Pointing out that Mr. Sprague violated the prohibition against public use in that

specific manner did not thereby convert the policy to one of opposition to religious

speech any more than challenging use of e-mails to promote chess tournaments or a

political candidate could be interpreted as anti-chess or anti-political speech. The policy

was anti-private use, not anti-religion.

These factual findings concerning the department's true motivation for terminating

Mr. Sprague's employment are dispositive of all of his claims in this action.[5] He is not

able to show that SVFD had a discriminatory policy against religious speech or that Mr.

Sprague was terminated because of his religion. He was terminated for not obeying

orders to stop using the e-mail and bulletin boards to promote his private activities. The

---

[5] *Shoemaker* involved a similar finding by a civil service commission. There a
demoted deputy police chief contended that his demotion was the result of retaliatory
action. The commission found otherwise. 109 Wn.2d at 505-07. Our court concluded
that the finding was factual in nature and should be given preclusive effect due to
collateral estoppel. *Id.* at 507-13.

No. 33352-3-III
*Sprague v. Spokane Valley Fire Dep't.*

policy of not permitting private use of the nonpublic forum was reasonable. Mr. Sprague

lost his ability to claim that there was an alternative policy when he failed to appeal the

civil service commission determination to the contrary.

The trial court correctly estopped Mr. Sprague from challenging the commission's

findings. There was no error.

Affirmed.

_____
Korsmo, J.

I CONCUR:

_____
Lawrence-Berrey, A.C.J.

13

No. 33352-3-III

LAWRENCE-BERREY, J. (concurring) — I concur in our conclusion that Spokane Valley Fire Department's (SVFD's) internal electronic employee communication (IEEC) policy[1] did not violate Jonathan Sprague's First Amendment free speech rights. I write separately to address one of the worthy points discussed by our dissenting colleague.

The dissent would find a violation of Mr. Sprague's free speech right to the extent SVFD prohibited Christian view postings that discussed topics addressed in its IEEC.

SVFD permitted Mr. Sprague, during work hours, to discuss his Christian views with his colleagues both verbally and through his personal e-mail. What SVFD prohibited was employees using its IEEC for nonbusiness purposes. Mr. Sprague knew SVFD's policy. SVFD repeatedly warned him that his postings violated its policy. Yet Mr. Sprague continued his postings. For this, he was terminated.

The dissent correctly acknowledges that SVFD could constitutionally limit its employees' free speech to the extent reasonably necessary to avoid liability under the First Amendment's Establishment Clause. The dissent concludes that SVFD did not

_____

[1] SVFD has two forms of nonpublic IEEC—by internal e-mail and by internal electronic bulletin board. The business-only policy applies to both.

strike a reasonably necessary balance and would remand for additional findings. I

disagree. As explained below, the balance struck by SVFD was reasonably necessary.

*Berry v. Department of Social Services*, 447 F.3d 642 (9th Cir. 2006) is

instructive. In that case, Daniel Berry worked for Tehama County's Department of

Social Services (Department), assisting unemployed and underemployed clients in their

transition out of welfare programs. *Id.* at 645-46. His work required him to conduct

client interviews, over 90 percent of which took place in his personal cubicle. *Id.* at 646.

Mr. Berry described himself as an evangelical Christian and thus required to share his

faith. *Id.* Upon his hiring, the Department told Mr. Berry that it had a policy that

prohibited employees from talking about religion with clients and the agencies its

employees contacted. *Id.* Similar to this case, the policy allowed employees to discuss

religion with other employees. *Id.* However, the policy prohibited displays of religious

items in areas such as cubicles, which were visible to clients. *Id.* at 647. The Department

director also prohibited Mr. Berry from using a specific conference room for prayer

meetings, which was a nonwork purpose. *Id.* at 646. Dissatisfied with these restrictions,

Mr. Berry sued the Department. *Id.* at 647-48.

The district court granted summary judgment for the Department, and the Ninth

Circuit affirmed. *Id.* at 645. In affirming, the Ninth Circuit applied the *Pickering*[2]

balancing test. *Id.* at 645-46, 648. That test recognizes that public employees do not lose

---

[2] *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed 2d 811 (1968).

2

the free speech rights they enjoy as citizens. *Id.* at 648. The test also recognizes that government, in its capacity as an employer, has interests in regulating the speech of its employees that differ significantly from those it possesses in connection with regulating the speech of its citizens. *Id.* (quoting *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed 2d 811 (1968)). These rights must be reconciled and, in doing so, courts must balance "'the employee's right to engage in speech and the government employer's right to protect its own legitimate interest in performing its mission.'" *Id.* (quoting *City of San Diego v. Roe*, 543 U.S. 77, 82, 125 S. Ct. 521, 160 L. Ed. 2d 410 (2004)). In addition, avoiding an Establishment Clause violation may be a compelling state interest, justifying an abridgement of free speech otherwise protected by the First Amendment. *See Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 112-13, 121 S. Ct. 2093, 150 L. Ed. 2d 151 (2001); *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394, 113 S. Ct. 2141, 124 L. Ed. 2d 352 (1993). The Ninth Circuit concluded:

> [T]he Department's concern with an Establishment Clause violation is well taken. The Department's clients seek assistance from Mr. Berry in his capacity as an agent of the state. Accordingly, they may be motivated to seek ways of ingratiating themselves with Mr. Berry, or conversely, they may seek reasons to explain a perceived failure to assist them. It follows that any discussion by Mr. Berry of his religion runs a real danger of entangling the Department with religion. . . . We conclude that under the balancing test, the Department's need to avoid *possible* violations of the Establishment Clause of the First Amendment outweighs the restriction's curtailment of Mr. Berry's religious speech on the job.

*Berry*, 447 F.3d at 650-51 (emphasis added).

3

Here, Mr. Sprague was permitted to discuss his Christian views with his colleagues during work hours, both verbally and through his personal e-mail. He was merely prohibited from using SVFD's IEEC for nonbusiness purposes. Such a restriction curtailed, but only to a small degree, Mr. Sprague's free speech rights. SVFD had a reasonable concern that a failure to restrain Mr. Sprague's postings could lead non-Christian employees to feel marginalized, thus exposing it to Establishment Clause liability in the event an employee reasonably believed this marginalization affected his or her terms or conditions of employment. Although such a concern might not be significant, neither was the abridgement of Mr. Sprague's free speech right. If we had to reach the issue, I would hold that here, SVFD successfully navigated between the Scylla of not respecting Mr. Sprague's free speech right and the Charybdis of exposing it to Establishment Clause liability by appearing to endorse a particular religious view.

Lawrence-Berrey, J.

No. 33352-3-III

FEARING, C.J. (dissenting) —

> *And Jesus came and said to them, "All authority in heaven and on earth has been given to me. Go therefore and make disciples of all nations, baptizing them in the name of the Father and of the Son and of the Holy Spirit, teaching them to observe all that I have commanded you; and lo, I am with you always, to the close of the age." Matthew 28:18-20 (Revised Standard Version).*

Jesus Christ commissioned his contemporary and present-day disciples to teach others in the Christian faith. Religions in addition to Christianity also direct adherents to teach the religion's moral lessons, rules of conduct, and eternal values. Since a person of faith spends much time with his or her coworkers, fellow employees often become the focus of sermonizing. The religious devotee encourages, and sometimes nags, coworkers, with promises of happier days, a fuller life, and eternal salvation, to adopt a different lifestyle. While proselytizing may annoy some coworkers, Washington proudly tolerates different religious views and braves open discussion of religion. This appeal

addresses the extent to which a government employee may use government property to fulfill his or her religious commission to tell coworkers of his faith.

Jonathan Sprague, a Spokane Valley Fire Department firefighter, employed the e-mail system of the fire department as a microphone for his religious views. The majority holds that the fire department held the prerogative to preclude the use of its e-mail for the voicing of religious messages. I note that a government entity, as a general proposition, enjoys this prerogative. Nevertheless, the Spokane Valley Fire Department opened its e-mail system to employee messages of solving personal problems and societal ills through the grace of God when the fire department delivered employee assistance programs newsletters, through the department e-mail, addressing those same problems and ills. The Spokane Valley Fire Department's discipline of Sprague for addressing a topic from Sprague's spiritual perspective constituted viewpoint discrimination in violation of Sprague's free speech rights. The government may not prefer secular chatter over religious oration. I therefore dissent from the majority's affirmation of summary judgment in favor of the fire department.

## Claims

Jonathan Sprague sues under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, the Washington Law Against Discrimination, chapter 49.60 RCW, the Washington Constitution, and the United States Constitution. The trial court dismissed all claims. On appeal, Sprague cites no law that establishes that the Washington

2

Constitution provided him greater liberty or protection than the United States Constitution's First Amendment. We do not address whether the state constitution provides a party broader rights unless that party briefs the factors announced by the state Supreme Court in *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986). *Malyon v. Pierce County*, 131 Wn.2d 779, 791, 935 P.2d 1272 (1997).

Jonathan Sprague also fails to address either the federal or state anti-discrimination in employment statutes in his appeal briefing. This court does not review issues not argued, briefed, or supported with citation to authority. RAP 10.3(a); *Valente v. Bailey*, 74 Wn.2d 857, 858, 447 P.2d 589 (1968); *Avellaneda v. State*, 167 Wn. App. 474, 485 n.5, 273 P.3d 477 (2012). Thus, this court need only ask if the conduct of the Spokane Valley Fire Department violated Jonathan Sprague's rights under the First Amendment to the United States Constitution.

Despite seeking to express his religious faith, Jonathan Sprague relies only on the free speech clause, and not the exercise of religion clause, of the First Amendment on appeal. I do not know if the analysis would change if Sprague relied on the free exercise clause.

Some Facts

I emphasize some facts. The Spokane Valley Fire Department allowed Jonathan Sprague to evangelize at work to the extent the proselytization did not disrupt business. The fire department permitted Sprague to speak with coemployees, during work hours, of

3

his faith and his desire that others enjoy salvation through Jesus Christ. Because of the unique work schedule of firefighters, the fire department allowed Sprague, during work time, to use a department computer to send messages about his devotion to Christ as long as Sprague used his personal e-mail address accessed through the computer and Sprague sent the messages to coworkers' private e-mail addresses.

Spokane Valley Fire Department Policy 171 (Policy) indirectly barred Jonathan Sprague's use of the department's e-mail system to send spiritual communiques. The policy read, in pertinent part:

> The electronic mail system hardware is [Spokane Valley Fire Department (SVFD)] property and all messages composed, sent, or received on the system are SVFD property. Therefore, the use of the electronic mail system is reserved solely for SVFD business and should not be used for personal business.

Clerk's Papers (CP) at 108. Sprague could use the fire department e-mail system to ask a fellow staffer to disclose his or her personal e-mail address in order to later communicate with religious messages to the personal address.

Because the Spokane Valley Fire Department maintained more than one fire station, a common physical bulletin board for all firefighters was not useful. Therefore, the fire department used its electronic mail system, in part, as a bulletin board. The record does not establish the entire gambit of subjects, on which firefighters could post on the electronic bulletin board. Deposition testimony gave examples of the selling of

4

concert tickets, snow tires, hay, and motorcycles and the seeking of recommendations for a babysitter.

Spokane Valley Fire Department Policy 171 and the fire department's application of the policy precluded Jonathan Sprague's use of the fire department's electronic bulletin board to post religious messages. Sprague formed the organization, Spokane Christian Firefighters Fellowship. He could post notices of the fellowship's meetings on the bulletin board. Sprague does not contend that the permission to post notices of organizational meetings and events opened the door to his being free to send messages with an overt religious content.

Jonathan Sprague contends that allowing other firefighters to sell used goods and seek recommendations for babysitters opened the bulletin board to him for purposes of religious evangelism. According to Sprague, the fire department allowed any speech, other than religious proselytizing, on the electronic bulletin board and this practice discriminated against him in violation of the First Amendment.

Jonathan Sprague contends that the Spokane Valley Fire Department electronic bulletin board contained other expressions of religious views. Nevertheless, he does not identify these expressions in his brief. When asked at oral argument to identify the page number or numbers of the record supporting this contention, Sprague's counsel could not identify a page number. Wash. Court of Appeals oral argument, *Sprague v. Spokane*

5

*Valley Fire Dep't.*, No. 303352-3-III (June 10, 2016) at 8:30 to 8:45 (on file with the court).

The record on appeal contains a Spokane County website page that explains a chaplaincy program provided for law enforcement officers. A second website page introduces a new chaplain. The writer of the second page quotes three verses from the Biblical book of Psalms. We do not know what relevance this page holds to the dispute between the Spokane Valley Fire Department and one of its firefighters. Jonathan Sprague testified that he received a copy of the chaplain's message, but he did not disclose from what resource he garnered a copy.

The Spokane Valley Fire Department, as most larger employers, managed an Employee Assistance Program (EAP). The fire department's health insurer, APS Healthcare, administered the program, and the insurer periodically prepared newsletters for fire department employees. APS mailed the newsletters to the fire department, and the department's administrative director forwarded the newsletters to fire department employees through the department's e-mail system.

Two newsletters from APS Healthcare respectively discussed a parent's communicating with a teenage child and coping with an "empty nest." Another newsletter is alternatively titled "Prevent Caregiver Depression" and "Quick Change Your Mood." CP at 285. The text of this letter is unreadable. A photo under the latter heading pictures a young lady meditating in what might be a lotus position.

6

An APS Healthcare newsletter advised a parent to be strict with regard to a teenage child's use of alcohol and marijuana. Another page of this newsletter discusses difficult behavior of a teenager, but the text is unreadable. Another newsletter identifies forms of eating disorders and treatments for the disorders.

An APS Healthcare newsletter on suicide reads:

> A person who attempts suicide will usually reach out for help first. Behaviors or cries for help may be subtle. Would you recognize the warning signs? If someone mentions having suicidal thoughts, don't shy away. Be ready to act by knowing the risk factors and second-guessing your denial response.
> Here's rule No.1: Ask about it. Don't let your fear hold you back. Empathizing or inquiring about suicidal statements saves lives. It is not what pushes a suicidal person over the edge. People who are contemplating suicide will usually talk about it, but they often need to be led into the conversation. Always take the matter seriously. Stay calm, and express your concern and assure the suicidal individual of how much he or she is loved and valued. Get a commitment from the individual to seek professional help, and agree to facilitate access to help by removing obstacles to it. Provide childcare or transportation, or summon emergency help if a threat is imminent.
> If you need immediate help for yourself or a loved one, call 911, 1-800-SUICIDE or 1-800-273-TALK.
> Other resources include your Employee Assistance Program, www.suicide.org, ww.afsp.org (American Society for Suicide Prevention) or www.survivorsofsuicide.com.

CP at 286.

One Employee Assistance Program newsletter discussed team building:

> If you are part of a new work team, be sure to invest timesharing among members to determine each person's strengths, limitations, and interests before assigning roles and tasks. This exercise reduces communication problems and conflicts that can arise later from a lack of

7

cohesion. Team problems often start at the beginning. Unfortunately, many teams perceive struggles with conflict as originating with the organization—the boss, politics, or other factors. Avoid these member pitfalls: 1) Believing your skills and experience demand that you do a disproportionate amount of work. 2) Assuming a team member's underperformance is due to a lack of personal organization, motivation, or skill (often team issues explain individual performance shortcomings). Always start with the team first when searching for solutions. 3) Failing to intervene early when there are indicators that one or two people are doing most of the team's work.

CP at 293.

Another APS Healthcare newsletter addressed the evils of gambling:

Most people have heard of compulsive gambling (gambling disorder), but do you know the earliest symptoms of this addiction? Legalized avenues for gambling are increasing nationally so more people are likely to be affected. Knowing the early signs can make intervention easier to stop the devastating condition. Reportedly, the earliest signs of the disorder are chasing losses, betting more than you can afford to lose, and feeling guilty about gambling. Sound familiar? Help is available. Start with your Employee Assistance Program or a professional counseling resource.

CP at 293.

Finally, an APS Healthcare message warns of binge drinking:

The Centers for Disease Control (CDC) has begun an effort to educate consumers about the dangers and huge economic cost of binge drinking—over $225 billion per year. It is a growing problem that they admit has been studied less than alcoholism. There are about 18 million alcoholics and regular alcohol abusers in the United States, but there are 38 million binge drinkers. That's about 15 [percent] of the population. Most are not alcoholics. Binge drinking means drinking five or more alcoholic drinks within a short period of time for men, and drinking two or more drinks within a short period of time for women. Binge drinkers consume alcohol on average four times per month. The highest average number of

8

drinks consumed during at least one of those drinking sessions is eight. Auto crashes, accidents, violence, and suicide are the key risks for binge drinkers. People between the ages of 18 and 34 do the most binge drinking, and the income group with the highest number of binge drinkers is those making over $75,000 a year. What can be done to reduce binge drinking? Becoming aware of your binge drinking is the first step and evaluating your own drinking pattern is next. Helping make others aware of the problem follows, but the CDC has other recommendations too. Learn more at the Centers for Disease Control at http://www.cdc.gov/vitalsigns/BingeDrinking/.

APS Healthcare's Employee Assistance Program. The EAP program through APS Healthcare assists organizations and their workforce in managing the personal challenges that impact employee well-being, performance and effectiveness. APS' life management consultants employ a comprehensive approach that identifies issues impacting the employee and assists them in developing meaningful solutions.

Please call the phone number below for more information about your Employee Assistance Program and the services available to you.

CP at 294.

Jonathan Sprague writes in his appeal brief that the Spokane Valley Fire Department invited or requested responses from firefighters to the health insurer's newsletters. Nevertheless, the citation to the record given by Sprague for this factual assertion does not support the contention. Sprague also writes in his brief that the fire department permitted the use of the e-mail system by employees for the expression of personal views linked to fire department business. He fails to cite the record for this factual proposition.

In early February 2012, Jonathan Sprague quoted a biblical scripture as part of a bulletin board post announcing a Spokane County Christian Firefighters Fellowship

9

meeting. On April 5, 2012, Sprague quoted two sacred scriptures as part of a bulletin

board announcement for the Fellowship. The announcement read:

> The April newsletter continues with our discussion on suicide. If you
> didn't catch March's kickoff in the series, be sure to read that first. (All
> back copies are available on the SCCFF website.) The question this month
> is what role does mental illness play in the act of suicide? Does mental
> failure cause moral failure? Can a person be pre-wired to sin? If so, are
> they still accountable for their actions? How do these ideas fit in with our
> foundational verse?
> *For none of us lives to himself, and none of us dies to himself. For if*
> *we live, we live to the Lord, and if we die, we die to the Lord. So then,*
> *whether we live or whether we die, we are the Lord's.* (*Romans 14:7-8*)
> We are also finishing up the series on fellowship by looking at the
> toughest group for us to deal with on a personal basis: nominal Christians.
> Most of us could have been put in that group ourselves once or twice and
> we work with others who currently are. What are we to do? How can we
> work with them to get the job done as brother firefighters, yet still follow
> the Scriptural mandates regarding backsliding brothers in Christ?
> *But actually, I wrote to you not to associate with any so-called*
> *brother if he is an immoral person, or covetous, or an idolater, or a reviler,*
> *or a drunkard, or a swindler—not even to eat with such a one.* (*1*
> *Corinthians 5:11*)

CP at 151.

On April 24, 2012, Jonathan Sprague accessed the Spokane Valley Fire

Department e-mail system from an outside source and used his fire department account to

send a message to the fire department e-mail accounts of forty-six employees. The e-

mail read, in part:

> Subject: Logo Design—Need your Vote
> Attached are some designs for the SCCFF [Spokane County
> Christian Firefighters Fellowship] logo. These are the ones that seem to
> wash out least in B&W. One might be a good for a patch design and

10

another embroidered on a polo or silk screened on a t-shirt. I would greatly appreciate a vote for both a patch and for a logo.
Jon.

CP at 157. One logo contained the Latin phrase: "Soli Deo Gloria," which translates into English as "Glory to God alone." CP at 158. A second logo contained an illustration of a flame, although one with a Christian heritage might consider the illustration to be a symbol of speaking in tongues or of the Christian holy day of Pentecost.

On April 30, 2012, Jonathan Sprague posted on the Spokane Valley Fire Department electronic bulletin board by use of the fire department e-mail system accessed from an outside source. Sprague also sent the post as an e-mail message to the fire department e-mail accounts of forty-six employees. The e-mail read:

> Newsletter
> The May newsletter celebrates a fresh look and a new logo. This is our new patch design and comes in a couple different variations. Another design for more casual use, similar to the one in the Classifieds, will be introduced soon.
> This month, we'll be reading what the Bible says about supplements. What? Yes, Peter actually talked about supplements in his second epistle, so read on and stock up now
> We're also continuing with our series on suicide, which will in part, answer last month's question, "Are the Darwin awards only given out in hell?" In other words, if you die as a result of your own foolish actions, what effect does that have on your eternal salvation? When the Apostle Paul says, "[W]hether we live or whether we die we are the Lord's", is he speaking conditionally or affirming our security in Christ? We all like simple answers to difficult questions, but the questions we ask may not fully represent the truths behind them.
> Activities

11

The SFD breakfast is coming up mid-month and a dinner barbecue at the Bowl and Picture [sic] on the 19th. Bring your bikes for a nice dinner spin. (Gotta burn off that homemade ice cream!).

Be watchful for some kayaking on the Little Spokane. The water is still very high, so we may have to hike the boats in, again, if we want to do another early spring run. Dates for the 2012 Biruka will be out soon.

As always, check out the website or [F]acebook page for more info about what's up, or give me a call.

Jon

CP at 165-66.

On May 29, 2012, Jonathan Sprague sent the following message to Spokane

Valley Fire Department employees' e-mail addresses:

Napoleon Bonaparte once said, "I know men and I tell you, Jesus Christ is no mere man. Between him and every other person in the world there is no possible term of comparison. Alexander, Caesar, Charlemagne, and I have founded empires. But on what did we rest the creations of our genius? Upon force. Jesus Christ founded his empire upon love; and at this hour, millions would die for him."

This newsletter article examines the purpose of leadership's power and authority, which has been a topic of no small interest as of late. There are clearly some radical differences in the leadership style of Jesus, who, according the Bible, was given all power and authority in heaven and on earth. Why has anyone ultimately been given power and authority over others, and how might they be best utilized in the fire station or in the home? We'll take [a] look at leadership from this Biblical perspective for some answers.

We're also keeping up with our series on suicide with a closer look at the intervention piece and the Biblical principles with which it may coincide. A lot has been said about the openPhoenix project, First Call Now, and other resources, most of which are designed to intervene when things are starting to spiral downhill. These types of programs are a relatively new, and by their nature don't fix anything, but rather, act as emergency medicine, arresting the damage and buying time for healing to occur. As such, they reflect the love, mercy, and compassion of God and of those who desire to have such traits in themselves.

12

We're getting together for kayaking on the 6th and breakfast on the 21st. Check out the classifieds [the fire department electronic bulletin board] for more details if you are interested.
Jon

CP at 168.

On July 16, Jonathan Sprague sent another message through the Spokane Valley

Fire Department e-mail system. The message read:

But what if your leaders are themselves are following the wrong path?
That is the question everyone faces at some point. Little doubt why trust is such a critical factor in effective leadership-followership relationships, especially when the leader has not given you what you need to know in order to be convinced of the plan yourself.
The answers to these questions can be found by studying the leadership-followership paradigm we see in Jesus as detailed in the Bible, as He interacts with His Father above and His disciples below. What was it, or who was it, that Jesus wanted His followers to follow and why? How might that impact your own leadership or followership? There are certainly differences in the world's understanding of followership and that of Christians. This article may stimulate some reflections along those lines as we continue to look at leadership from a Biblical viewpoint.
We're also looking to discover what type of impact holding a religious belief has on suicide. Are some faiths better or worse in this regard? If so, why? And, which ones? The answers might help you to better understand others who may be heading down a dangerous path. Check it out, here. You might be surprised.
There is an ice cream social at my house on the 21st, where I'd love to discuss these ideas and "sharpen swords" on some of the finer points.
As I've said before, if you do not wish to receive these emails, please let me know and I will remove you from the list. If you would rather get them at a different email address, I'd be happy to send them there instead. Even though they deal with fire service topics, nothing in these emails is endorsed by the department anymore [sic] than other such discussions on similar topics, as should be abundantly clear by this time.

13

CP at 265.

On July 31, 2012, Jonathan Sprague wrote to his coworkers, through the fire department e-mail system:

> If your home can weather a disaster, it is only because it was built that way. The life of a firefighter who survives personal disasters is no less well designed. Stepping beyond suicide prevention, this article looks at ways from the Bible that we can methodically build our lives in ways that will last through the worst of days, beginning with *Building Construction 101—Site Plans*. I think you'll find these truths to have been a great help to many brother and sister firefighters, such as Jason Webster (SFD) and his wife Jessica, who is battling cancer. I know so many of you have experienced similar pains and found similar help from the Lord. Be sure to lift them up as you consider your own situation.
> On another note, have you ever wondered what a career of fighting fire is worth in the end? There must be more to it than a pension and fast fading memories of the "glory days." King Solomon enjoyed more accomplishments and pleasures than you or I ever could and he had much to say when he was all through. Perhaps you'll find some interesting things to consider as we look at *Firefighting - A For-Profit Enterprise*.

CP at 203.

A September 1, 2012, e-mail message from Jonathan Sprague to his coworkers, on the fire department system, read, in part:

> We started a series last month on building construction—how best to build a life that can weather the storms that invariably come, and we firefighters really have some big storms. The Bible has much to say about what and who comprise a solid foundation. Some of the verses will certainly be familiar. I hope you'll find the article encouraging and, perhaps, a reminder to check beneath the surface to see what's down there at the core of your life. Cracks in the foundation can result in catastrophic damage if not caught early.

CP at 268.

14

One Spokane Valley Fire Department firefighter asked Jonathan Sprague to be removed from the list of coworkers to whom Sprague sent his religious messages. No one complained to the fire department administration about messages from Sprague. No employee questioned the fire department administration as to whether the department sponsored or approved of Sprague's messages. The fire department agrees that, assuming Jonathan Sprague's proselytizing through the department's e-mail system led to costs incurred by the fire department, the cost could not be calculated and would be de minimus.

In a September 6, 2012, notice of disciplinary action, Spokane Valley Fire Department Fire Chief Mike Thompson notified Jonathan Sprague that causes of discipline included posting, on the department e-mail system, "negative comments about the leadership of SVFD and written content that was of a religious nature." CP at117.

## Collateral Estoppel

The majority underscores two factual findings of the civil service commission and concludes that those findings bind this reviewing court. First, the commission found that the Spokane Valley Fire Department terminated Jonathan Sprague's employment because of insubordination, not for religious reasons. I disagree that this factual finding binds this reviewing court at least to the extent of requiring us to rule that the fire department did not discriminate on the basis of the viewpoint of Sprague's messages. The finding directly relates to Sprague's First Amendment argument, and thus the finding is akin to a

15

conclusion of law. Collateral estoppel does not extend to conclusions of law rendered by administrative agencies. *Silverman v. JRL Food Corp.*, 196 F.3d 334, 335-36 (2d Cir. 1999); *Nat'l Labor Relations Bd. v. Markle Mfg. Co. of San Antonio*, 623 F.2d 1122, 1126 (5th Cir. 1980); *Mosher Steel Co. v. Nat'l Labor Relations Bd.*, 568 F.2d 436, 440 (5th Cir. 1978).

When a question on review implicates constitutional rights necessitating consideration of legal concepts in the mix of fact and law and an exercise of judgment about the values that animate legal principles, the factors favoring de novo review predominate. *Levey v. D'Angelo*, 819 So. 2d 864, 867 (Fla. Dist. Ct. App. 2002); *Smith v. Fresno Irrig. Dist.*, 72 Cal. App. 4th 147, 156, 84 Cal. Rptr. 2d 775 (1999). Whether an employee's speech is protected under the First Amendment and whether a restriction on speech is constitutional are reviewed de novo. *Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 648 (9th Cir. 2006); *Daily Herald Co. v. Munro*, 838 F.2d 380, 383 (9th Cir. 1988).

Jonathan Sprague was insubordinate because he sought to sermonize. A fire department employee is mutinous only if he disobeys a lawful order, and an order violating one's First Amendment rights is unlawful. Therefore, to the extent the fire department breached Sprague's constitutional rights, Sprague must not be considered insubordinate.

The civil service commission also found that the Spokane Valley Fire Department evenly applied Policy 171 and did not discriminate based on Jonathan Sprague's

16

expression of Christian views. This court's majority may conclude that this finding ends our analysis as to whether the fire department violated Sprague's First Amendment rights. If so, I disagree. We should adopt the commission's finding to the extent that the finding confirms the evidence that the fire department did not allow one or more individuals to proclaim their religious views, while denying Sprague the opportunity to preach his devout beliefs. Nevertheless, as already outlined, the undisputed facts show that the fire department disseminated information from its health insurer on the department's e-mail system about personal struggles and family crises that could interfere in an employee's mental health and job performance. In turn, the fire department precluded Jonathan Sprague from discussing, by department e-mail, these same topics from his Christian perspective.

Based on the undisputed facts, this court should address, without deference to the civil service commission, the constitutional question of whether the fire department unlawfully discriminated against Sprague because of his spiritual message. The commission's determination of a lack of discrimination was a mixed question of fact and law. Again, collateral estoppel does not apply to conclusions of law. We review anew constitutional questions embedded in a medley of fact and law.

### Forum Analysis and Viewpoint Discrimination

The precise issue before this court is whether the Spokane Valley Fire Department needed to permit Jonathan Sprague the use of the department's e-mail system to speak

17

from a religious vantage point on topics affecting firefighters' mental health when the department disseminated information on those same topics. The majority does not directly address this critical question. I dissent from the majority because the answer is in the affirmative.

Jonathan Sprague wanted to utilize an e-mail system established, operated, and paid for by a government agency, his employer. In short, he desired to use government property to advance his Christian message. Protected speech is not permissible in all places and at all times. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799, 105 S. Ct. 3439, 87 L. Ed. 2d 567 (1985). Nothing in the constitution requires the government freely to grant access to all who wish to exercise their right to free speech on every type of government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. at 799-800. The government, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. at 800; *Greer v. Spock*, 424 U.S. 828, 836, 96 S. Ct. 1211, 47 L. Ed. 2d 505 (1976).

The United States Supreme Court has adopted a forum analysis as a means of determining when the government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other

purposes. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. at 800. Accordingly, the extent to which the government can control access depends on the nature of the relevant forum owned by the government. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. at 800.

The Supreme Court has fashioned three or four classifications of fora, for purposes of free expression: a traditional public forum, a designated public forum, a limited public forum, and a nonpublic forum. Sometimes the designated and limited public fora are treated as one category. The First Amendment rules to apply depend on the classification. The initial task for a court evaluating restrictions placed on speech or expressive conduct on government property is to define the nature of the property at issue. *Byrne v. Rutledge*, 623 F.3d 46, 53 (2d Cir. 2010). We will see later, however, that the identification of the forum is irrelevant when a speaker, such as Jonathan Sprague, argues viewpoint discrimination.

Because a principal purpose of traditional public fora is the free exchange of ideas, speakers can be excluded from a traditional public forum only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S. Ct. 948, 74 L. Ed. 2d 794 (1983). A traditional public forum includes a street, sidewalk, public square, or a park. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,

19

460 U.S. at 45; *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515, 59 S. Ct. 954, 83 L. Ed. 1423 (1939).

A designated public forum includes a civic arena available for use to private organizations. A limited public forum may be a room that a government entity opens on a temporary basis for a single topic. *Summum v. Callaghan*, 130 F.3d 906, 914 (10th Cir. 1997). As with a traditional public forum, when the government intentionally designates a place or means of communication as a public forum, speakers cannot be excluded without a compelling governmental interest. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. at 800 (1985). Virtually all regulations on speech in a limited or designated public forum receive the highest level of First Amendment scrutiny. *Byrne v. Rutledge*, 623 F.3d at 53 (2d Cir. 2010). Access to the fourth category of fora, a nonpublic forum, however, can be restricted as long as the restrictions are reasonable and are not an effort to suppress expression because of the viewpoint expressed by the speaker. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. at 800.

Jonathan Sprague is not simply a member of the public. He is an employee of the government. Nevertheless, forum analysis applies even when the speech restricts insiders. *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267, 108 S. Ct. 562, 98 L. Ed. 2d 592 (1988); *Berry v. Dep't of Soc. Servs.*, 447 F.3d at 652-54 (9th Cir. 2006).

The parties agree that the electronic e-mail system of the Spokane Valley Fire Department constitutes a nonpublic forum. The majority and I agree with the parties.

20

The United States Supreme Court held, before common exploitation of the Internet, that a government entity's internal mail system is not a public forum. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. at 46. Courts, including Washington courts, have since held an agency's e-mail system to be a nonpublic forum when the facilities are not open to the public. *Loving v. Boren*, 956 F. Supp. 953, 955 (W.D. Okla. 1997); *Knudsen v. Wash. State Exec. Ethics Bd.*, 156 Wn. App. 852, 865-66, 235 P.3d 835 (2010); *Herbert v. Pub. Disclosure Comm'n*, 136 Wn. App. 249, 263-64, 148 P.3d 1102 (2006).

In a nonpublic forum, the government has maximum control over communicative behavior. *Byrne v. Rutledge*, 623 F.3d at 53 (2d Cir. 2010). Speech in nonpublic fora may be restricted if the distinctions drawn are reasonable in the light of the purpose served by the forum and are viewpoint neutral. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. at 806 (1985); *Herbert v. Pub. Disclosure Comm'n*, 136 Wn. App. at 259 (2006). Jonathan Sprague does not argue the restriction of his e-mail use was unreasonable. He focuses on viewpoint neutrality.

We must determine if the Spokane Valley Fire Department's preclusion of Jonathan Sprague's discussion of topics from a religious outlook was viewpoint neutral when the mental health newsletter discussed some of the same topics from a secular view. In evaluating viewpoint neutrality within the context of a nonpublic forum, two guiding principles emerge. First, the government may permissibly restrict content by

21

prohibiting any speech on a given topic or subject matter. *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106, 121 S. Ct. 2093, 150 L. Ed. 2d 151 (2001). The State may be justified in reserving its forum for certain groups or for the discussion of certain topics. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829, 115 S. Ct. 2510, 132 L. Ed. 2d 700 (1995). The state may properly exclude an entire subject. *Choose Life Ill., Inc. v. White*, 547 F.3d 853, 865 (7th Cir. 2008). Second, however, once the government permits some comment on a particular subject matter or topic, it may not regulate speech in ways that favor some viewpoints or ideas at the expense of others. *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394, 113 S. Ct. 2141, 124 L. Ed. 2d 352 (1993). Accordingly, while a speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purpose of the forum, the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject. *Cornelius*, 473 U.S. at 806 (1985).

Consistent with the general rule prohibiting viewpoint discrimination, speech discussing otherwise permissible subjects cannot be excluded on the ground that the subject is discussed from a religious viewpoint. *Good News Club v. Milford Cent. Sch.*, 533 U.S. at 111-12 (2001). The government may not exclude a theistic or atheistic perspective on the debate. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. at 831-32 (1995). There is no logical difference, for purposes of free speech, between one

22

speaker's invocation of religion to inspire conduct or explain a topic and another's invocation of teamwork, loyalty, morality, or patriotism to discuss a topic. *Good News Club v. Milford Cent. Sch.*, 533 U.S. at 111.

The test of viewpoint neutrality is the same regardless of whether the forum is a designated or limited public forum or a nonpublic forum. *Byrne v. Rutledge*, 623 F.3d at 54 n.8. Therefore, when the speaker claims viewpoint discrimination, the identification of the forum becomes irrelevant.

Jonathan Sprague principally relies on the United States Supreme Court decisions in *Good News Club v. Milford Central School* and *Rosenberger v. Rector & Visitors of University of Virginia*. The two opinions, together with *Lamb's Chapel v. Center Moriches Union Free School District* comprise a trilogy that compels the conclusion that the Spokane Valley Fire Department imposed viewpoint discrimination to the disfavor of Sprague.

In *Lamb's Chapel v. Center Moriches Union Free School District*, the Supreme Court confronted a New York law that permitted private citizens to use public school premises for "social, civic, and recreational meetings" but, as construed by state courts, prohibited such use for "religious purposes." 508 U.S. at 386. Consistent with the statute as interpreted, the school district refused to permit an evangelical church to use school facilities to show a James Dobson film series on family and parenting. The Supreme Court held the school to have violated the free speech clause. While treating the school

premises as a nonpublic forum, the Court noted that control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral. Nevertheless, the Court concluded that the ban was not viewpoint neutral because it impermissibly prohibited comment on otherwise permissible subject matters, such as child rearing and family values, on the ground that the film sought to discuss those subject matters from a religious perspective.

In *Rosenberger v. Rector & Visitors of University of Virginia*, the nation's highest Court considered a university program that dispensed funds to various student groups, but excluded from eligibility any student group engaged in "religious activities," defined as activities that "primarily promotes or manifested a particular belief in or about a deity or an ultimate reality." 515 U.S. at 825. Applying that rule, the university denied funding to a student group that published a magazine focused on the "Christian Perspective at the University." 515 U.S. at 826. The Supreme Court found the denial unconstitutional. The restriction constituted viewpoint discrimination, rather than a legitimate content restriction. The University did not exclude religion as a subject matter, but selected, for disfavored treatment, student journalistic efforts with religious editorial viewpoints. In an oft-quoted passage, the Court philosophized:

> Religion may be a vast area of inquiry, but it also provides, as it did here, a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered.

24

*Rosenberger v. Rector & Visitors of University of Va.*, 515 U.S. at 831.

Finally, in *Good News Club v. Milford Central School*, the United States Supreme Court confronted a school district policy that allowed private use of school facilities for "instruction in any branch of education, learning or the arts" and "social, civic and recreational meetings and entertainment events" but excluded use "by any individual or organization for religious purposes." 533 U.S. at 102-03. Consistent with the policy, the school district refused to allow a private Christian organization to hold weekly afterschool meetings that would include a Bible lesson and memorizing scripture. The Court again invalidated the ban. The school district engaged in viewpoint discrimination when it excluded the club from the afterschool forum because the club sought to address a subject otherwise permitted under the rule, the teaching of morals and character, from a religious standpoint.

Passages from some decisions imply that the government engages in viewpoint discrimination only if the government officials that restrict the speech disagree with the speaker's ideology or perspective. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. at 812-13 (1985); *Victory Through Jesus Sports Ministry Found. v. Lee's Summit R-7 Sch. Dist.*, 640 F.3d 329, 336 n.4 (8th Cir. 2011); *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 82 (1st Cir. 2004). Jonathan Sprague presented no evidence that the Spokane Valley Fire Department Chief or Board of Commissioners disagreed

25

with Sprague's religious views. The officials simply wanted to exclude all religious speech. Despite this framing of the rule in many decisions, no decision specifically holds that viewpoint discrimination must involve the government actors' disagreement with the religious views espoused. Case after case invalidates viewpoint discrimination on the sole ground that the government wanted a prohibition on religious speech for administrative purposes not for the reason of stifling religion or a sect of religion.

Jonathan Sprague contends that allowing other firefighters to sell used goods and seek recommendations for babysitters opened the bulletin board to him for purposes of religious evangelism. According to Sprague, the fire department allowed any and all speech, other than religious proselytizing, on the electronic bulletin board and this practice discriminated against him in violation of the First Amendment. Sprague contends the fire department opened a forum for all speech. I disagree. A government agency may open a nonpublic forum to limited topics. Allowing the use of an e-mail system to sell goods does not unlock the forum to religious indoctrination. *DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958, 967 (9th Cir. 1999).

I instead dissent because the Spokane Valley Fire Department targeted Jonathan Sprague's e-mail messages because of their religious content, while Sprague's messages addressed some of the same topics bespoke by the fire department or the department's health insurer through the e-mail system. Both the newsletters and Jonathan Sprague's missives mentioned suicide and how to prevent suicide. A newsletter spoke of

26

depression. Arguably, Sprague also mentioned coping with depression. The fire department's topic of team building may overlap Sprague's lecture on leadership. Unfortunately, the law gives no guidance as to what constitutes one topic or subject matter for purposes of viewpoint discrimination. Spokane Valley Fire Department Policy 171 did not prohibit department employees from responding to APS Healthcare's newsletters by examining the topics of teen discipline, gambling addiction, alcoholism, depression, eating disorders, and team building from a secular perspective. Presumably other firefighters within the fire department could have forwarded their views on the e-mail system as to these topics from a humanistic or philosophic position. The latitude given other workers to express their views confirms the fire department's need to grant Jonathan Sprague the freedom to espouse resolving these ills through a relationship with Jesus Christ.

The majority writes that the Spokane Valley Fire Department did not discipline Jonathan Sprague because of the religious nature of his speech, but rather because Sprague used the e-mail system for his private use and not for the business of the fire department. This comment by the majority, however, fails to note that the fire department allowed other private uses of the e-mail system by firefighters. The only instance when the fire department enforced Policy 171 to preclude private use of its property was when Sprague spoke from a religious vantage point. Moreover, Spokane Valley Fire Department notices of discipline scolded Sprague for the religious content of

27

his messages, including the use of religious symbols, not the private or personal nature of the messages.

The majority's observation also fails to recognize that, as part of its business of operating a firefighting force, the fire department forwarded newsletters to employees for the purpose of promoting mental health. Jonathan Sprague's advancing of employee's mental health, through a Christian perspective, also furthered the business of the fire department.

The Spokane Valley Fire Department relies on *Berry v. Department of Social Services*, 447 F.3d 642 (9th Cir. 2006). Nevertheless, *Berry* is inapposite. Daniel Berry worked for the employment services division of the California Department of Social Services. His duties included assisting unemployed clients with a transition from a welfare program to employment. He often interviewed clients. Berry's faith demanded that he share his faith with and pray with clients during these interviews. The Department of Social Services allowed Berry to talk about his religious faith to his colleagues, but barred him from sharing his views and praying with clients. The Ninth Circuit held that the department did not violate the free speech clause with this prohibition. The court noted a fear that clients of the Department of Social Services might ingratiate themselves with Berry by succumbing to his evangelism. The clients might conclude the government wanted a religious conversion in order to gain state benefits.

28

The Spokane Valley Fire Department has not accused Jonathan Sprague of proselytizing residents of Spokane Valley or others who receive fire department services. His evangelism was limited to coworkers.

First Amendment Establishment Clause

The Spokane Valley Fire Department raises as a defense the United States Constitution's First Amendment Establishment Clause. The fire department argues that, if it allowed Jonathan Sprague the opportunity to espouse his spiritual messages on the department's e-mail system, the department would promote or sponsor religion and thereby violate the Establishment Clause. Along these lines, the fire department contends it may engage in viewpoint discrimination if it can show a compelling interest to do so and the avoidance of establishing a religion presents a compelling state interest. The United States Supreme Court has held that the interest of the State in avoiding an Establishment Clause violation may be a compelling interest that justifies an abridgement of free speech otherwise protected by the First Amendment. *Widmar v. Vincent*, 454 U.S. 263, 271, 102 S. Ct. 269, 70 L. Ed. 2d 440 (1981).

I disagree with the Spokane Valley Fire Department's analysis. An even-handed, neutral right of access to the government forum does not violate the Establishment Clause. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. at 839 (1995). The Establishment Clause is not violated when the government treats religious speech and other speech equally and a reasonable observer would not view the government practice

29

as endorsing a religion. *Santa Fe Indep. Sch. Dist. v. Jane Doe*, 530 U.S. 290, 302, 120 S. Ct. 2266, 147 L. Ed. 2d 295 (2000). In *Lamb's Chapel v. Center Moriches Union Free School District*, 508 U.S. 384 (1993), the Supreme Court rejected the school district's argument that allowing the showing of a religious film would be viewed by the public as government advancement of religion when the school district opened its doors to a wide variety of private organizations.

The Spokane Valley Fire Department presented no evidence that any employee concluded that the fire department sponsored or approved of any message sent by Jonathan Sprague. Sprague's persistent and aggressive evangelism would alert other employees to the fact that the fire department did not sponsor his preaching. The fire department's discipline of Sprague confirmed its dissociation with the message. Sprague invited recipients the option to reject the communications.

Speech in Workplace

An urgent difference between this appeal, on the one hand, and *Good News Club v. Milford Central School, Rosenberger v. Rector & Visitors of University of Virginia*, and *Lamb's Chapel v. Center Moriches Union Free School District* is the fact that the speakers in the three United States Supreme Court decisions were not employees of the government agency. Therefore, I address this appeal from the perspective that Jonathan Sprague was an employee of the government.

30

On the one hand, the State has an interest as an employer in regulating the speech of its employees that differs significantly from those it possesses in connection with regulation of the speech in the citizenry in general. *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968). This is because the government, as an employer, has an interest in promoting the efficiency of the public services it performs through its employees. *Pickering v. Bd. of Educ.*, 391 U.S. at 568. Accordingly, a government employer may impose certain restraints on the speech of its employees that would be unconstitutional if applied to the general public. *City of San Diego v. Roe*, 543 U.S. 77, 80, 125 S. Ct. 521, 160 L. Ed. 2d 410 (2004). On the other hand, a government employee does not relinquish all First Amendment rights otherwise enjoyed by citizens just by reason of his or her employment. *City of San Diego v. Roe*, 543 U.S. at 80.

Courts apply a balancing test when confronted with constitutional challenges to restrictions on public employee speech in the workplace. *Tucker v. State of Cal. Dep't of Educ.*, 97 F.3d 1204, 1210-11 (9th Cir. 1996). Under *Pickering v. Board of Education*, 391 U.S. at 568 (1968), the United States Supreme Court requires a court evaluating restraints on a public employee's speech to balance the interests of the employee, as a citizen, in commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees and the State's legitimate administrative interests.

31

The *Pickering* balancing test applies to an employee's religious speech. *Berry v. Dep't of Soc. Servs.*, 447 F.3d at 650 (9th Cir. 2006). A topic of public concern, for purposes of *Pickering* balancing, includes religion.

The government holds the burden to establish that its legitimate administrative interests outweigh the employee's First Amendment rights. *Clairmont v. Sound Pub. Health*, 632 F.3d 1091, 1106-07 (9th Cir. 2011). To prove an employee's speech interfered with working relationships, the government must demonstrate actual, material, and substantial disruption, or reasonable predictions of disruptions in the workplace. *Clairmont v. Sound Pub. Health*, 632 F.3d at 1107.

The Spokane Valley Fire Department had no compelling, let alone important, interest in restricting Jonathan Sprague's speech. The fire department did not expose itself to violation of the Establishment Clause by tolerating Sprague's evangelism. Sprague did not increase the costs of the fire department's e-mail system by the sending of his messages.

The government may prohibit employee speech on its grounds that it is disruptive to business. *United States v. Kokinda*, 497 U.S. 720, 733, 110 S. Ct. 3115, 111 L. Ed. 2d 571 (1990). Sprague's speech caused no disruption in the workplace other than the administrative hassle of sanctioning and firing Sprague. Nevertheless, Sprague should not be charged with this disruption if his speech was unlawfully restricted.

32

We do not know the time of day when Jonathan Sprague sent his messages. We know that firefighters typically work twenty-four hour shifts, during which they have free time. The fire department does not complain that the e-mail messages interfered in Sprague's performance as an employee or the performance of the recipients of his message.

*Tucker v. State of California Department of Education*, 97 F.3d 1204 (9th Cir. 1996) is analogous. The state Department of Education promulgated a rule that prohibited employees from engaging in any oral or written religious advocacy in the workplace. The Ninth Circuit Court of Appeals held the rule violative of employees' First Amendment rights. The court noted that the department provided no evidence of a disruption in the workplace by limited proselytizing. Time spent by supervisors in enforcing the rule could not be counted toward calculating work disruption. The department presented no evidence that coemployees complained about one employee's proselytizing.

One might find it odd that a government entity must permit an employee to use the government's e-mail system to espouse religious messages. Nevertheless, in other decisions, the speaker, whether an employee of the government or member of the public, used government property. In *Lamb's Chapel v. Center Moriches Union Free School District*, 508 U.S. 384 (1993), the Supreme Court permitted religious society members to walk in government corridors, occupy a government room, and repose in government

33

chairs to view a religious film. Presumably the religious entity even used a film screen

owned by the government. In *Rosenberger v. Rector & Visitors of University of Virginia*,

515 U.S. 819 (1995), the nation's highest Court directed the government to fund a

religious publication.

The Spokane Valley Fire Department observes that it did not comment or opine on

the topics discussed within APS Healthcare's newsletters. The fire department further

observes that the EAP newsletters corresponded with the fire department's benefits

package, and, in turn, the newsletters were related to the fire department's business. I

find these observations of no help to the fire department. Whether or not the fire

department prepared or merely forwarded the newsletters prepared by another entity was

irrelevant. The fire department allowed mention of topics, on which Jonathan Sprague

later touched. As already mentioned, if steps advocated by APS Healthcare could

improve the fire department's work environment, arguably Jonathan Sprague's

recommendations from a religious standpoint could benefit the workplace.

### Disposal of Appeal

I would reverse the summary judgment granted the Spokane Valley Fire

Department and remand the case to the superior court for further proceedings. The

record shows that many of Jonathan Sprague's religious expressions went beyond

responding to the APS Healthcare newsletters. Sprague wrote about interacting with

nominal Christians, choosing a religious logo, and health supplements, subject matter

34

never mentioned in the newsletters. The trier of fact should determine the extent that

Sprague's missives overlapped topics in the APS Healthcare newsletters and the

magnitude that Sprague's preaching did not address newsletter subjects. The trier of fact

should also determine whether or not the fire department would have terminated

Sprague's employment based on the noncorresponding messages and whether such

termination would be warranted. If the trier of fact determines that Sprague's termination

from employment was not otherwise justified, it should further determine what, if any,

damages Sprague suffered from the viewpoint discrimination. I respectfully dissent:

Fearing, J.

_____
Fearing, C.J.